IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 17, 2009 Session

## DAVID RAMEY, FORMER PERRY COUNTY SHERIFF v. PERRY COUNTY, TENNESSEE

Appeal from the Circuit Court for Perry County
No. 3438     Robbie T. Beal, Judge

No. M2008-01571-COA-R3-CV - Filed July 30, 2009

The sheriff of Perry County sued the county mayor under Tenn. Code Ann. § 8-20-101 seeking additional employees, equipment, and vehicles to properly perform his duties. The trial court ordered the county to provide the sheriff's office with funding for two additional deputies as well as gasoline, equipment, and uniforms. We have concluded that the trial court erred in ordering the county to fund two new road deputies and in authorizing expenditures to support road deputies. The evidence supports the need for one new detention officer and a part-time detention officer. We remand for a hearing on the reasonableness of the attorney fee award.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Tommy Ethen Doyle, Linden, Tennessee, and Douglas Thompson Bates, Centerville, Tennessee, for the appellant, Perry County, Tennessee.

Ernest Wilson Williams, Franklin, Tennessee, for the appellee, David Ramey.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

David Ramey was elected Sheriff of Perry County in August 2006. In October 2006, Ramey filed this action against John Carroll, the county mayor, seeking relief under Tenn. Code Ann. § 8-20-101, a statute authorizing the sheriff, under certain conditions, to "make application to the judge of the circuit court in the sheriff's county, for deputies and assistants, showing the necessity therefore, the number required and the salary that should be paid each." Tenn. Code Ann. § 8-20-101(a)(2).

In his petition Ramey alleged that the statutory duties of the office of sheriff had increased and that because the county commission and county mayor had denied his budget request for fiscal year 2006-2007, he had "no alternative but to bring this action to seek court intervention to order funding for positions, personnel, and equipment, and staff which is necessary for the Sheriff to perform his statutory and constitutional duties as mandated by law. . . ." Ramey asserted that, in order for the sheriff's office to perform its duties and to "be brought to national standards average" with respect to the number of personnel for the county population, the office needed to receive "not only what [the sheriff] previously proposed for the Sheriff's department and jail" but funding to employ additional deputies and staff, including the following:

a. An additional 23 deputies in order to be brought to national standards;

b. Additional funding to have one (1) courthouse security guard to be certified;

c. Funding for a full time position as secretary;

d. Additional funding for gas increase and car maintenance as all vehicles are older models;

e. Funding for mental health needs which has been totally eliminated by the defendant and the county commission;

f. Funding for travel, which would include training;

g. Funding for in-service training, which is required;

h. Funding for replacement vehicles;

i. Additional funding for 11 deputies [for the county jail] in order to be brought to T.C.I. standards;

j. Additional funding for in-service training [for the county jail] which is required;

k. Additional funding for the medical and dental needs [of the county jail].

Ramey also requested additional funding to enable his office to be competitive with neighboring counties with respect to salaries, benefits, and equipment.

After some discovery and a failed attempt to resolve the matter through mediation, Ramey filed a motion in November 2007 stating that the county commission had now approved the 2007-2008 budget and requesting that the court substitute the actual and proposed 2007-2008 budget documents for the 2006-2007 budget documents attached to the original complaint. The trial court allowed the amendment.

The case was heard on December 5 and 6, 2007. Jerry Lee Havlick, Chief Deputy of the Perry County Sheriff's Department and a department employee since 2000, testified that he purchased his gun, belt, badge, handcuffs, bullets, and shoes with his own money; the sheriff's department provided only the pants and shirt. The department also provided a rain coat. According to Deputy Havlick, the same was true for all of the other deputies. Deputy Havlick estimated the cost of these various pieces of clothing and equipment.

Deputy Havlick testified that two patrol deputies were on duty in Perry County during each shift with the exception of one shift when there were three deputies on duty. He opined that the department needed two extra deputies for each shift plus a "couple for our vacation, sick time, overtime." Thus, he recommended the addition of eight deputies.

Deputy Havlick testified that there were five hundred miles of road in Perry County. Deputy Havlick stated that when he was working as a road deputy (until August 2006), he sometimes did not have backup, for example when making an arrest on a domestic call or a traffic stop. If he waited for backup, the department would have to "call somebody out," which would take "a considerable amount of time." Deputy Havlick estimated that he arrested people without backup about 90 percent of the time.

As Deputy Havlick explained, the county was under contract with the cities of Linden and Lobelville to provide them with twelve hours of patrol in a 24-hour period. One deputy would be occupied in those cities, and the other would be patrolling in the rest of the county. To compensate the county for these services, the two cities were to provide six cars to the county at a cost of approximately $150,000. When school was dismissed in the afternoon, the deputies were at the school zones, one in Linden and one in Lobelville. If an officer received a call, he would have to leave the school zone to answer the call.

The sheriff's department had a vehicle for each man, including the sheriff, for a total of fourteen vehicles plus one spare vehicle. Several of the cars did not have lights or sirens. A vehicle list introduced into evidence showed mileages ranging from 123,902 to 199,202. The six new cars to be provided by Lobelville and Linden would be used to replace some of these vehicles. Deputy Havlick testified that the eight new deputies he was requesting would each need a patrol car, training, and equipment. The department currently had nine road deputies, so the additional deputies would make a total of 17 deputies.

According to Deputy Havlick, Perry County had a high turnover rate in road deputies and had lost four deputies since Sheriff Ramey took office. Certified officers were paid twelve dollars ($12.00) per hour. The officers received no benefits other than an accidental death benefit.

Kenneth J. Holder, a court security officer and Tennessee Incident Based Reported System (TIBRS) representative for the sheriff's department, testified about statistical documents that were

introduced into evidence. The statistics showed an increase in the number of reports written by officers from 2005 up until the time of the hearing. There had been an increase in arrests for domestic assaults in the past year. Mr. Holder testified that Perry County's rate of cleared incidents was 43.60%. The statistics also showed an increase in the number of accidents, including car crashes and other accidents involving property damage or injury, since 2005 and an increase in the number of tickets written over the same period.

As to criminal warrants, Mr. Holder's records showed the following statistics: In 2007, 707 warrants entered, 740 warrants served. In 2006, 1,122 warrants entered, 1,194 warrants served. In 2005, 211 warrants entered, 93 served. With respect to civil papers, 1,289 were entered and 1,291 were served in 2007; 528 were entered and 613 were served in 2006; and 260 were entered and 153 were served in 2005.

Mr. Holder testified that, as to all of the information about which he had been testifying, there had been an increase since Sheriff Ramey took office. The road deputies served the warrants. Mr. Holder further testified that there had been a "substantial" backlog in papers to be served when Sheriff Ramey took office, and that Sheriff Ramey had "made it a priority to get them served." On cross-examination, Mr. Holder admitted that the sheriff's deputies had generally been serving civil papers in a timely manner in 2006 and 2007.

Suzanne Ramey, wife of Sheriff Ramey, was employed as a nurse and later as an administrator at the county jail. She testified about measures she had instituted to reduce the medical costs incurred by the jail. Ms. Ramey established an agreement with a local medical center to treat the inmates so they would not always have to be taken to the emergency room. She also started charging other counties for out-of-county inmates housed in the Perry County jail; the sheriff's department collected approximately $675,000 from other counties in the previous year.

The Perry County jail was licensed for 58 beds. Ms. Ramey testified that the jail actually had 62 beds. At the time of the hearing, at least two-thirds of the county jail inmates were from out of county. The jail had twelve detention deputies, three on each shift. One deputy had to be in the control room, one would "float," and the third would be assigned to "cook and laundry, hygiene, things like that." The floater "will have to go with him [a deputy] when he enters a pod; and also, if someone gets booked in, they both have to stop what they're doing and go into the booking room."

Ms. Ramey opined that the jail needed five more detention deputies, for a total of seventeen. She testified that it was jail policy that employees not go into the area where the inmates were housed, "the pod," alone; but this was difficult to follow with the current staffing levels. Sometimes, they had to find a transport officer or a maintenance man to prevent someone from having to go into the pod alone.

Ms. Ramey testified that the jail was currently certified to meet minimum Tennessee Corrections Institute (TCI) standards. She discussed what the jail had to do to receive that certification. Ms. Ramey stated that the jail would lose state revenue of approximately $150,000 a

year if it was decertified. According to Ms. Ramey's testimony, when the inspector, Bob Bass, came to the jail, they had to "cheat a little" in order to comply with the regulations. The jail did not have a full-time booking officer; when Mr. Bass was there, they would "pull somebody off the floor" to be in the booking room if needed. The jail did not have a separate cook, so they would have trustees cooking in the kitchen without a deputy being in the room with them. When Mr. Bass was in the building, Ms. Ramey made sure there were no trustees in the kitchen without a guard.

Ms. Ramey was involved in the budget preparation process for the jail and the sheriff's department. She testified that she did not know if and when the budget meetings were held, but the jail and sheriff's department submitted proposed budgets. The difference between the sheriff's proposed budget for the jail and the budget approved by the county commission was approximately $200,000. Questioned about the proposed budget for the sheriff's department, Ms. Ramey stated that they had requested seven deputies.

Ms. Ramey also testified that the jail had a high turnover rate in its employees. Since Sheriff Ramey came into office, a total of 48 employees had left the sheriff's department or jail; 26 of those employees had resigned.

On cross-examination, Ms. Ramey acknowledged that the budget meetings may have been announced in the local paper. The newspapers including the notices were introduced into evidence. She admitted that the sheriff did not attend any budget meetings on the 2007-2008 budget.

Arvell Ezell prepared annual financial reports for the Perry County sheriff's department and testified about the reduction in the average daily cost per inmate from the 2005-2006 fiscal year to the 2006-2007 fiscal year. Mr. Ezell attributed the reduction to a decrease in the medical bills for inmates.

J. R. Warren, a county commissioner in Perry County, testified about the commission's approval of the budgets for the various county departments.

Dr. Larry Miller, a professor of criminal justice and criminology at East Tennessee State University, testified as an expert for the plaintiff. Sheriff Ramey hired Dr. Miller to determine the needs of the sheriff's department and jail. Dr. Miller testified that he used two different methodologies, a staffing formula methodology and a comparative analysis with other Tennessee counties of similar population,[1] to evaluate Perry County's situation. He visited the Perry County jail facility and the sheriff's office.

Dr. Miller stated that Perry County had a population density of 18 persons per square mile, whereas the other counties to which he compared it had an average population density of over 35 per square mile. Dr. Miller opined that the fact that the population of Perry County was "spread out over a large area of land surface . . . dramatically affects the response time rates of police officers going

---

[1] The parties stipulated that Perry County's population was 7,631 according to the 2000 census.

to a call." Perry County's crime index of 52.8 (meaning about 53 offenses per 1,000 persons in the population) was higher than the average crime index of the similar counties, which was 32. Dr. Miller stated that "Perry County is seeing an increase in violence, such as assaults[,] . . . theft, vandalism, larceny."

Perry County's detention facility had an above average number of inmate beds as compared to the similar counties. Dr. Miller's comparison showed that "Perry County is under or below average in terms of the budget allocations for the jail." Perry County's ratio of patrol officers per 1,000 population was 1.5, whereas the average for comparable counties was 2.2. In Perry County, each officer on patrol was covering a little over 200 miles, whereas the comparable counties averaged 75 miles per officer. The detention officer to inmate ratio in Perry County was a little over one to 16, whereas the comparison counties averaged one officer for every ten inmates. According to Dr. Miller, the National Corrections Association's recommendation for county jails was no more than one officer for eight inmates. The statewide average in Tennessee was one to ten. Dr. Miller opined that Perry County would need at least three additional detention officers per shift, or nine additional officers, to bring the ratio down to one to ten.

Based upon his staffing analysis of the sheriff's department, Dr. Miller opined that "they would have to have at a bare-bones minimum . . . eight [additional] patrol deputies and probably have to have nine in order to cover days off, sick, military leave, things like this . . . ." He stated that the sheriff's department "would have to have four officers per shift just to cover, provide backup, answer calls." Dr. Miller testified about the danger to officers resulting from not having backup, especially for domestic calls and traffic stops at night.

Dr. Miller stated that the sheriff's department should provide its employees with all needed equipment and uniform items as well as appropriate training. He opined that "this county should be giving a take-home police vehicle to deputies because of the size of the county."

On cross-examination, Dr. Miller stated that, in his analysis of the sheriff's department's personnel needs, he had taken into account duties including the transportation of prisoners within the county, transportation of mental patients, patrolling the roads, and traffic assistance at the schools. In his report, Dr. Miller stated that the gross yearly income for Perry County deputies was within the state average.

Dr. Miller opined that the $75,000 per year payments being provided by Linden and Lobelville did not cover the cost of the policing services being provided to those towns by the county sheriff's department. He did not consider budgetary constraints in making his manpower recommendations.

The plaintiffs also introduced into evidence the deposition testimony of Bob Bass, an inspector with the Tennessee Corrections Institute, an agency that inspects county jails and trains their officers. At the time of his deposition in November 2007, Mr. Bass had been inspecting the Perry County jail for seven years. His most recent inspection in Perry County was on August 1,

2007.  Mr. Bass found no deficiencies at the Perry County jail and recommended certification for 2007.  Mr. Bass explained that a jail's failure to obtain certification results in increased insurance premiums and often indicates issues that could make a jail vulnerable to liability in a civil lawsuit.  Mr. Bass testified that he would make recommendations about jail operations that were not in the official report.  These unofficial recommendations were not mandatory on the jail.

When asked whether the Perry County jail would continue to be certified at present staffing levels, Mr. Bass stated: "My professional opinion is they would be in jeopardy of losing that certification. . . . [T]he way they're operating would only lead one to believe that someone is working overtime, someone is working double shift, someone is putting forth an extra effort to make sure that those standards are met."  Mr. Bass used a different methodology than Dr. Miller when assessing staffing.  Instead of relying on ratios, Mr. Bass performed a staffing analysis of a particular facility.  He believed such an analysis would lead to the same result reached by Dr. Miller, a ten-to-one ratio of prisoners to staff.  An unofficial staffing analysis of the Perry County jail in January 2005[2] applied two different staffing formulas.  Under one formula, the jail would need five positions, for a total staff of 35.  Under the second formula, the jail would need a total of 25 officers.  Mr. Bass recommended the lower figure, 25 officers.  At that time, the jail had 16 officers.

John Carroll, County Mayor of Perry County, the defendant, testified that his office had approved purchase orders from the sheriff's department to purchase handcuffs, badges, and ammunition.  His office had not turned down any requests for these items.  Mr. Carroll also testified that his office had not received any requests to purchase guns for the sheriff's department.

Mr. Carroll stated that, when Sheriff Ramey took office, the budgeted expenditures for the sheriff's department were approximately $562,000 and for the jail were approximately $500,000.  For the 2007-2008 fiscal year, the county commission increased the budgeted expenditures for the sheriff's department to approximately $762,000 and for the jail to approximately $740,000.  Mr. Carroll also testified that law enforcement funding (including funding for the sheriff's department and the jail) in Perry County had increased since Sheriff Ramey took office from about $140 to almost $200 per capita.

Mr. Carroll introduced a letter he wrote to the county department heads, including Sheriff Ramey, to inform them of the deadline for submitting their 2007-2008 budgets.  According to Mr. Carroll, he received the budgets from the sheriff's department and the jail several months after the deadline.

---

[2]Mr. Bass stated that, at the time of this study, the new Perry County jail was 95% complete but not yet operational.

<u>Trial court's ruling</u>

The court entered its order on January 7, 2008. With respect to the sheriff's department, the court ordered as follows:

A. Effective July 1, 2008, the Perry County Legislative Body shall provide for an additional, two (2) full-time deputies at the current salary level, one a road deputy and another available for road work and detention work at the jail. The County shall insure that each of these deputies has a vehicle assigned to him/her.

B. Effective February 1, 2008, the Perry County Commission shall provide for an additional $20,000.00 for the line item of gasoline for the Perry County Sheriff's Department.

C. Effective July 1, 2008, the Perry County Commission shall set for 08-09 fiscal year budget line item for gasoline for the Perry County Sheriff's Department at $60,000.00; whereas, the current 07-08 Budget has $38,000.00 for gasoline for the Sheriff's Department.

D. Effective February 1, 2008, the Perry County Commission shall fund an additional $2,500.00 for law enforcement equipment.

E. Effective July 1, 2008, the Perry County Commission shall set the sum of $7,500.00 for law enforcement equipment in the 08-09 fiscal year budget; whereas, the 07-08 Budget currently includes $5,000.00 for equipment.

F. Effective February 1, 2008, the Perry County Commission shall fund an additional $1,000.00 for uniforms, badges, belts, and shoes.

As to the county jail, the court ordered that, effective July 1, 2008, the county commission fund "an additional detention officer at the current salary levels and that one of the two (2) deputies awarded to the Sheriff's Department shall share in jail duties." The court further ordered that the county legislative body "shall not reduce any line item of the 2007-2008 Budget previously adopted pertaining to the Sheriff and Jail Departments without the express consent of the Perry County Sheriff." The court ordered the defendant to pay $7,500.00 for the sheriff's expert witness, Dr. Miller, but denied the sheriff's request for attorney fees.

Both sides filed motions objecting to portions of the court's January 7, 2008 order. On June 12, 2008, the court ordered that $25,000.00 in attorney fees be paid to the law firm that represented the sheriff. The court denied the defendant's motion for a hearing on attorney fees. The county mayor appealed.

The county mayor has raised a number of issues on appeal, which we summarize as follows: (1) Whether the trial court erred in allowing the sheriff to proceed on the fiscal year 2007-2008 budget; (2) whether the trial court applied the wrong legal standard in evaluating the sheriff's budgetary requests; (3) whether the trial court erred in ordering the county commission to provide certain funds to the sheriff's department; and (4) whether the trial court erred in ordering the county commission to fund additional jail personnel. Both sides raise issues regarding the award of attorney fees and costs.

STANDARD OF REVIEW

We review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Where the trial court did not make findings of fact, we must "conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). We accord great deference to a trial court's determinations regarding witness credibility. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999). Issues of statutory construction present questions of law. *Lipscomb v. Doe*, 32 S.W.3d 840, 843-44 (Tenn. 2000); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999).

ANALYSIS

Proper fiscal year

When the sheriff originally filed suit in October 2006, he was proceeding based upon the 2006-2007 fiscal year. The sheriff was asking the court to order the county commission to authorize certain funds denied by the county commission in the budget process.[3] When the case was still pending into the next fiscal year and after the budget for the 2007-2008 fiscal year had been approved, the sheriff sought the court's permission to proceed under the 2007-2008 budget documents. The county mayor argues on appeal that the trial court erred in allowing the sheriff to proceed on the 2007-2008 fiscal year because "there was no evidence that the Sheriff had gone [through] the application procedure and local budget process as required by T.C.A. § 8-20-101(2) [sic]."

The county mayor's argument on this issue is sparse. He asserts that "the correct procedure would have been for the Plaintiff/Appellee to have filed a new petition since T.C.A. § 8-20-101, et

---

[3] It appears from the complaint that the sheriff was also requesting that the court order funds in addition to those requested during the budget process.

seq., requires a petition to be filed within 30 days after the Sheriff's budget request is rejected by the County Commission." At the beginning of the December 5, 2007 hearing, the trial court allowed the sheriff to supplement the complaint to include the 2007-2008 fiscal year. The county mayor did not object to this procedure; counsel for the county mayor stated: "As long as I understand he's just traveling under the '07-'08 budget for purposes of the lawsuit, there's no objection." Thus, the county mayor waived this objection.

Later, during Ms. Ramey's testimony, counsel for the county mayor stated that although he had not objected to the amendment of the complaint, he had not "conceded that it's proper to go under this [2007-2008] budget now." The county mayor argued that "unless [Ms. Ramey] can say that the '07-'08 budget was presented [to the county commission], it's incompetent evidence." With respect to the county mayor's contention concerning the sheriff's alleged failure to participate in the budget process for 2007-2008, the evidence showed that the county mayor received budget proposals for the sheriff's department and the jail but that the sheriff did not attend the budget committee meetings on the 2007-2008 budget. The county mayor has not cited any authority that would require the sheriff to attend such meetings. The sheriff conceded at trial that he was asking the court only for those budget expenditures previously requested from the county commission.

We find no merit in the county mayor's argument.

### Standard to be applied by court under Tenn. Code Ann. § 8-20-101

This case was brought by the sheriff under the provisions of Tenn. Code Ann. § 8-20-101, which states in pertinent part:

> (a) Where . . . *sheriffs cannot properly and efficiently conduct the affairs and transact the business of such person's office by devoting such person's entire working time thereto*, such person may employ such deputies and assistants as may be actually necessary to the proper conducting of such person's office in the following manner and under the following conditions, namely:
> . . . .
> (2) The sheriff may in like manner make application to the judge of the circuit court in the sheriff's county, for deputies and assistants, showing the necessity therefor, the number required and the salary that should be paid each[.]

Tenn. Code Ann. § 8-20-101(a) (emphasis added).

As a general rule, the General Assembly has left county budget decisions in the hands of the county legislative bodies, so that "[p]reparing the county budget is essentially a political process intended to reflect the desires of the county's residents." *Jones v. Mankin*, No. 88-263-II, 1989 WL 44924, *2 (Tenn. Ct. App. May 5, 1989). To understand Tenn. Code Ann. § 8-20-101, it is helpful to know the history behind its enactment:

There was little fiscal coordination among local officials in Tennessee until the early part of the twentieth century. Prior to that time, many local officials were outside the county budget process because they funded their agencies with fees collected for their services. The General Assembly did not favor this system, and after four unsuccessful attempts, abolished it in 1921. *See* Act of April 6, 1921, ch. 101, 1921 Tenn. Pub. Acts 188. Thereafter, the fees were treated as local revenue, the salaries of the local officials were set by statute, and the local agencies' budgets were set by the local legislative bodies.

Many local officials affected by the "anti-fee bill" were popularly elected in their own right. They were not supervised by the county executives, and since they had the same elective mandate as the members of the county legislative body, they were reluctant to surrender any portion of their independence to other county officials. Independence fosters budget disagreements. Accordingly, the General Assembly found it necessary to include a dispute resolution procedure in the "anti-fee bill."

The procedure chosen by the General Assembly is now embodied in Tenn. Code Ann. § 8-20-101. It brought the courts into the budget fray even though they have no special expertise or experience in management, budgeting, or finance. For over sixty years now, the courts have been cast in the role of reluctant arbiters of the budget disputes between certain local officials and their county government.

*Jones*, 1989 WL 44924, at *2-3 (footnotes omitted). Thus, Tenn. Code Ann. § 8-20-101 establishes the procedure for resolving a dispute between a sheriff and the county legislative body over the budget for his office.

A court's authority under Tenn. Code Ann. § 8-20-101 with respect to sheriffs is limited. Consistent with the language of Tenn. Code Ann. § 8-20-101(a)(2), a court is generally limited to authorizing salaries for deputies and assistants and directly related equipment and training necessary for their employment. *Bane v. Nesbitt*, No. M2006-00069-COA-R3-CV, 2006 WL 3694444, *12 (Tenn. Ct. App. Dec. 14, 2006); *Jones*, 1989 WL 44924, at *5.

Moreover, Tenn. Code Ann. § 8-20-101 has been interpreted to allow the courts to authorize additional personnel only with respect to the performance of certain duties. Sheriffs' duties were originally defined by the common law; later, many of the sheriffs' duties were prescribed by statute. *Jones*, 1989 WL 44924, at *4. A sheriff's statutory duties, which now encompass common law duties, include four main categories: "(1) serving the process and orders of the courts; (2) attending the courts; (3) operating the jail; and (4) keeping the peace." *Id.* These duties can also be categorized on the basis of the manner in which the sheriff is compensated for them:

(1) The duties imposed and defined by statute. The fee to be paid for the performance of these duties generally is prescribed by statute.

-11-

(2) Duties which the common law annexes to the office of sheriff (some of which are now covered by statute) for which no fee or charge is specified in payment. These duties are generally referred to as "ex officio" duties or services.

*Id.* at *5. The manner in which the sheriff is paid for a service has been held to determine the scope of a court's authority under Tenn. Code Ann. § 8-20-101:

> The determination of the value of the sheriff's ex officio services is particularly within the knowledge of the county legislative body. Accordingly, Tenn. Code Ann. § 8-24-111 (1988)[4] gives the county legislative body complete control over the budget for the sheriff's ex officio services.
>
> We should construe Tenn. Code Ann. §§ 8-20-101(2) and 8-20-120[5] harmoniously with Tenn. Code Ann. § 8-24-111. When read together, these statutes stand for the proposition that sheriffs can invoke the procedures in Tenn. Code Ann. § 8-20-101(2) only with regard to the personnel needed to perform the statutory duties for which the statutes provide a fee. *Thus, in considering a Tenn. Code Ann. § 8-20-101(2) application for increased personnel-related expenditures, the courts may consider only those requests that are related to statutory duties for which the sheriff collects a fee.*

*Jones*, 1989 WL 44924, at *5 (citations omitted) (emphasis added). This analysis has repeatedly been applied in subsequent cases. *See Smith v. Plummer*, 834 S.W.2d 311, 314 (Tenn. Ct. App. 1992); *Bane*, 2006 WL 3694444, at *8; *Dorning v. Bailey*, No. M2004-02392-COA-R3-CV, 2006 WL 287377, *7 (Tenn. Ct. App. Feb. 6, 2006).

Under the rule quoted above, in considering a sheriff's application pursuant to Tenn. Code Ann. § 8-20-101, a court "may consider only those requests that are related to statutory duties for which the sheriff collects a fee.*" Jones*, 1989 WL 44924, at *5. We will discuss the application of this rule to each of the challenged budget authorizations below.

---

[4] Tenn. Code Ann. § 8-24-111 provides that "[t]he county legislative bodies of the different counties shall, at their first session in each and every year, make such allowance as they, in their discretion, think sufficient to compensate their sheriffs for ex officio service."

[5] Tenn. Code Ann. § 8-20-120 states:

Notwithstanding any other provision of law to the contrary, county legislative bodies shall fund the operation of the county sheriff's department. The sheriff may appoint such personnel as may be provided for in the budget adopted for such department. No county governing body shall adopt a budget absent the consent of the sheriff, which reduces below current levels the salaries and number of employees in the sheriff's department. In the event the county governing body fails to budget any salary expenditure which is a necessity for the discharge of the statutorily mandated duties of the sheriff, the sheriff may seek a writ of mandamus to compel such appropriation.

<u>Challenged expenditures for sheriff's department</u>

The county mayor argues that the sheriff failed to prove that he was unable to perform the duties of his office for which he is authorized to collect a fee, and that the court therefore erroneously authorized certain expenditures for the sheriff's department.

Tenn. Code Ann. § 8-20-101(a) contemplates the hiring of deputies and assistants only when a sheriff "cannot properly and efficiently conduct the affairs and transact the business of such person's office by devoting such person's entire working time thereto." In accordance with Tenn. Code Ann. § 8-20-101(b), the sheriff must show "the necessity for assistants, the number of assistants required, and the salary each should be paid." *Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003). The sheriff must "present detailed evidence that has the cumulative effect of showing that the work he is required to perform by law cannot be done with existing manpower." *Dorning*, 2006 WL 287377, at *8 (quoting *Reid v. Anderson*, No. 84-57-II, 1985 Tenn. App. LEXIS 2776, *4 (Tenn. Ct. App. Mar. 27, 1985)). Moreover, as discussed above, the court may only consider funding requests relating to statutory duties for which the sheriff collects a fee.

(1) <u>Two additional deputies</u>--one a road deputy and one to be available as a road deputy and to do detention work at the jail. In presenting his case, the sheriff did not differentiate between statutory duties for which he could collect a fee and other duties. Chief Deputy Havlick testified about the need for more backup in performing traffic stops and domestic calls, but these are not duties for which the sheriff can collect a fee. Peacekeeping duties are considered ex officio duties because the sheriff cannot collect a fee for those services, and "the sheriff's desire to employ more deputies to patrol the county does not provide the court with justification to authorize the sheriff to hire more field deputies." *Jones*, 1989 WL 44924, at *8. Mr. Holder's statistics showed an increase in crime and in papers to be served, but he testified that Sheriff Ramey and his staff had been able to keep current on serving papers.

The following statement made by the trial court in making its ruling suggests that the court did not fully make the necessary distinction between those duties that are fee-generating and those that are not: "The Court believes [two new road deputies are] appropriate so that the sheriff's department can carry out their statutorily mandated needs, perform the court house responsibilities, jail responsibilities, continue to serve process effectively, and also to provide effective backup to the officers now in the field." In announcing its decision from the bench, the trial court also stated:

> [T]he sheriff has demonstrated a need that for the safety of his officers, that they need to be afforded the ability to have backup on the calls that they are dispatched out to, and right now that's not possible. Further, this Court understands its demands on the county and understands that I take deputies off the street, both when I'm in court and when Judge Doyle is in court. . . . [T]he fact is that we're utilizing resources that the sheriff's department could use elsewhere. That includes service of process and things like that. Now while there's been some evidence that those areas are not suffering, I don't want to send the message to the sheriff right now, go ahead and leave us out

-13-

in the cold; devote all of your resources to these other endeavors; and then come back in a year and I'll give you the deputies. That's the wrong message. . . . I don't think the sheriff should be prejudiced because he's attempting to do the best job he can with what he has.

While it is true that using deputies to perform one type of duty may affect the availability of deputies for another type of duty, we cannot accept this reasoning alone as a justification for increased funding under Tenn. Code Ann. § 8-20-101. The county commission has sole authority over the funding of ex officio duties, and the court may only authorize additional funding for statutory duties for which the sheriff may collect a fee. To justify an award of additional funding under Tenn. Code Ann. § 8-20-101, a sheriff must do more than just argue that the two types of duties affect one another.

Apart from the proof concerning the jail (addressed below), the proof did not establish that Sheriff Ramey's office was having trouble performing its fee-generating duties. There was no proof concerning how much time road deputies devoted to performing fee-generating activities such as service of process, attendance on the courts, or transporting prisoners. We believe the evidence preponderates against the trial court's decision to award funding for additional road deputies.

This case is distinguishable from previous cases in which the court has noted specific evidence of a need for additional personnel to help the sheriff fulfill his statutory fee-generating duties. *See Bane*, 2006 WL 3694444, at *9 (road deputies spent substantial time transporting inmates and there was substantial backlog of unserved warrants); *Roberts v. Lowe*, No. 03A01-9610-CC-00333, 1997 WL 189345, *5 (Tenn. Ct. App. Apr. 16, 1997) (falling behind on serving papers, inadequate personnel for jail); *Jones*, 1989 WL 44924, at *8 (patrol personnel attending court, guarding and transporting prisoners, serving process; increased demand for those services, and sheriff unable to keep up with demand). Rather, this case is analogous to several other cases in which the court has found insufficient evidence to justify increased funding for road deputies. *See Plummer*, 834 S.W.2d at 314 (sheriff "unable to show the necessity needed for additional road personnel to perform any statutory duty"); *Cunningham v. Moore County*, 604 S.W.2d 866, 868 (Tenn. Ct. App. 1980).

(2) Additional $20,000 in funding for gasoline for the sheriff's department. The sheriff put on proof that the county commission had budgeted $38,000 for gasoline for the 2007-2008 fiscal year, whereas the department requested $70,000. The trial court found as follows:

I think the proof was basically that [the sheriff's department] had a budget of thirty-four thousand [for gasoline] and it increased to thirty-six or something like that this past year; that they had actually used something in the neighborhood of fifty. I respect the manner in which Mrs. Ramey is trying to handle the budget. Instead of going to the county commission midway through the year and saying, hey, we've used up our gas budget, I don't see why we shouldn't simply provide the gas necessary to perform their duties on the front end.

Again, there is no differentiation made between gasoline used for statutory fee-generating activities and ex officio duties such as peacekeeping. Under the circumstances, the evidence preponderates against the trial court's decision to increase the line item for gasoline. The trial court was provided with no basis for determining how much, if any, additional funding was needed to allow the sheriff to perform his statutory fee-generating duties.

(3) Additional $2,500 for law enforcement equipment effective February 1, 2008, a total of $7,500 for law enforcement equipment (representing a $2,500 increase from the previous year's budget) effective July 1, 2008, and an additional $1,000 for uniform, badges, belts, and shoes effective February 1, 2008. In its ruling from the bench, the court stated that "I assume this [law enforcement equipment] would include pistols, ammunition–not just for officers in training, but ammunition, as well, for daily use–anything else that would assist the officers in being able to perform their duties effectively."

As stated above, the court's authority under Tenn. Code Ann. Tenn. Code Ann. § 8-20-101(a)(2) is generally limited to authorizing salaries for deputies and assistants and directly related equipment and training necessary for their employment. *Bane*, 2006 WL 3694444, at *11. In approving an award of money for equipment and training of new officers, the court in *Bane* distinguished the facts before it from those present in *Dorning*:

> Importantly, the appellate court in *Dorning* found that the sheriff "failed to prove how the condition of his fleet [of vehicles] adversely affected his ability to perform the statutory duties for which he may collect a fee." [*Dorning*, 2006 WL 287377 at *17]. In the instant case, however, Sheriff Bane sought funding for equipment and training directly incident to and necessary for the employment of the additional officers awarded. Without such, the new officers will be wholly unable to perform their statutory duties. As in *Jones v. Mankin*, we "do not read Tenn. Code Ann. §§ 8-20-101(2) and 8-20-120 so narrowly that they cannot apply" to equipment and training "required to support the personnel who are performing the statutory duties." *Jones*, 1989 WL 44923 at *5. Under the particular circumstances of this case, therefore, we hold that the trial court had the authority to award the equipment and training directly incident to and necessary for the employment of the new officers.

*Bane*, 2006 WL 369444, at *12. As discussed above, with the exception of a deputy's assignment to help at the jail, we find that the evidence preponderates against the trial court's determination to authorize two new deputies. Therefore, the evidence does not support new equipment, training, badges, and uniforms for new deputies for the sheriff's department.

(4) The county mayor challenges the trial court's order that "the Perry County Legislative Body shall not reduce any line item of the 2007-2008 Budget previously adopted pertaining to the Sheriff and Jail Departments without the express consent of the Perry County Sheriff." Tenn. Code Ann. § 8-20-120 includes the following provision: "No county governing body shall adopt a budget absent the consent of the sheriff, which reduces below current levels the salaries and number of

-15-

employees in the sheriff's department." *See also* Tenn. Code Ann. § 8-20-104 (regarding order fixing number and salaries of deputies). We know of no other limitations on a county legislative body's powers with respect to a particular fiscal year's budget. In the event the county legislative body otherwise fails to provide funding necessary to the performance of the sheriff's statutory fee-generating duties, the sheriff's recourse is to file an action pursuant to Tenn. Code Ann. § 8-20-101. It is not within the court's power to constrain the county legislative body's budget authority by making a general order prohibiting line item reductions.

Challenged expenditures for county jail

In his brief, the county mayor states the following issue: "Whether or not the Trial Court erred in directing the Defendant/Appellant to fund additional personnel to operate the jail." The brief does not, however, contain any argument on this point. Operation of the county jail is a duty for which the sheriff can collect fees. *See* Tenn. Code Ann. § 8-21-901. In light of the testimony of Ms. Ramey, in combination with the testimony of Mr. Bass and Dr. Miller, the evidence does not preponderate against the trial court's decision to authorize a new detention officer. Furthermore, Ms. Ramey testified that the jail sometimes had to request assistance from road deputies. In its ruling from the bench regarding funding for the sheriff's department, the trial court noted evidence that road deputies were called upon for assistance in "making sure when the jailers go back into the population of the jail, that they're safe so the deputies can stand on one side of the bar and the jailers can go back and take care of the business of the jail." We, therefore, modify the trial court's decision to allow for a part-time detention officer. Thus, the sheriff is authorized to hire an additional full-time detention officer and a part-time officer.

Attorney fees and costs

The county mayor argues that the trial court erred in overruling its motion for a hearing on the reasonableness of the attorney fees requested by the sheriff and in awarding attorney fees of $25,000 and an expert fee of $7,500. The sheriff asserts that the trial court erred in failing to award the full amount of attorney fees and costs requested.

Tenn. Code Ann. § 8-20-107 provides: "The cost of all cases shall be paid out of the fees of the office collected by such officers, and they and each of them shall be allowed a credit for the same in settlement with the county trustee." This provision has been interpreted to give a trial court the discretion to make an attorney fee award in a case brought pursuant to Tenn. Code Ann. § 8-20-101. *Cunningham*, 604 S.W.2d at 869; *Jones*, 1989 WL 44924, at *10. When the court makes such an award, "the attorney's fee becomes a proper expense of the sheriff's office to be paid from funds available to the sheriff." *Jones*, 1989 WL 44924, at *10. A trial court also has the authority to award discretionary costs, including expert witness fees. Tenn. R. Civ. P. 54.04. The county mayor does not challenge the court's authority to award attorney fees and expert witness fees, but he does assign error to the fees awarded in this case.

-16-

We review a trial court's decision to award attorney fees under an abuse of discretion standard. *In re Estate of Greenamyre*, 219 S.W.3d 877, 885 (Tenn. Ct. App. 2005). A trial court abuses its discretion only when it applies an incorrect legal standard or when it reaches a decision against logic or reasoning that causes an injustice to the complaining party. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under this standard, we are required to uphold the ruling "as long as reasonable minds could disagree about its correctness." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). Furthermore, "we are not permitted to substitute our judgment for that of the trial court." *Id*. Thus, under the abuse of discretion standard, we give great deference to the trial court's decision. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003).

In its January 7, 2008 order entered after the trial, the trial court awarded a discretionary fee of $7,500 to compensate Dr. Miller, but denied the sheriff's request for an award of attorney fees. The affidavit and statement submitted by counsel for the sheriff showed a total balance of fees and costs incurred by the attorney of $38,133.14. In declining to award attorney fees, the court noted that the sheriff was partly to blame for the budget dispute. The sheriff filed a motion to alter or amend the judgment, again requesting an award of attorney fees. The county mayor filed a motion asking the court to grant a hearing "on the issue of reasonableness and necessity of the amount of attorney fees being requested by Plaintiff's counsel."

The motion to alter or amend was held on May 20, 2008, and the court awarded $25,000 in attorney fees.[6] The court denied the county mayor's motion for a hearing on the reasonableness of the fees. We have concluded that the trial court erred in denying the defendant's motion for a hearing. In *Wilson Management. Co. v. Star Distributors Co.*, a case involving a contractual clause authorizing an award of reasonable attorney fees, our Supreme Court stated that it was "incumbent upon the defendant to pursue the correction of that error in the trial court [an award of attorney fees based upon a percentage of the recovery] by insisting upon a hearing upon that issue." *Wilson*, 745 S.W.2d 870, 873 (Tenn. 1988). The Court further observed that, "if a trial judge is prepared to fix a reasonable fee . . . without first hearing plaintiff's proof, defendant must be accorded a full opportunity to cross examine plaintiff's witness and present evidence on that issue." *Id*. This same procedure has been held to apply to a determination of attorney fees under a state statute. *Nutritional Support Servs., Ltd. v. Taylor*, 803 S.W.2d 213, 215 (Tenn. 1991). If the defendant does not request a hearing, however, the trial court has the discretion to proceed without taking further proof on the reasonableness of the attorney fees requested. *See Kahn v. Kahn*, 756 S.W.2d 685, 697 (Tenn.1988).

---

[6]In awarding attorney fees, the court observed:

> I wanted it [the court's previous decision on attorney fees] to have a chilling effect on the filing of these kinds of suits. That's why I didn't award attorney's fees. . . . But on the same token, I did not want it to have . . . personal ramifications upon an elected official at the time of the Perry County government. Did Sheriff Ramey act in bad faith in dealing with the county? Yes. I made that clear on the record. I remember making that comment. With all due respect to the Perry County Commission, however, I . . . found specifically that they may not have been paying as much attention to the sheriff and his concerns as they should have.

Because the county mayor requested a hearing on the reasonableness of the attorney fees requested, we believe the trial court erred in denying the county mayor the chance to have such a hearing.

As to the $7,500 expert fee, the trial court accepted Dr. Miller's testimony as to his fees, and we find no abuse of discretion in the trial court's award.

CONCLUSION

We affirm, as modified, the trial court's decision to authorize additional jail personnel, but reverse the other decisions regarding expenditures for the sheriff's department. We affirm the award of discretionary costs and remand for a hearing on the amount of attorney fees. Costs of this appeal are assessed against both parties equally.

_____
ANDY D. BENNETT, JUDGE